J-S84016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: I.J.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.M., MOTHER | No. 3769 EDA 2015 |

Appeal from the Order Entered November 10, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000365-2014
CP-51-DP-0000694-2012

BEFORE: OLSON, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY SOLANO, J.:       **FILED NOVEMBER 22, 2016**

Appellant, N.M. ("Mother"), appeals from the order involuntarily terminating her parental rights to I.J.W., born December 2011 ("the Child"). Upon careful review, we affirm.

On April 18, 2012, the Department of Human Services ("DHS") received a Child Protective Services report with allegations that a four-month-old was brought by both parents, J.W. ("Father") and Mother, to the emergency room of the Albert Einstein Medical Center in Philadelphia; the

_____

[*] Former Justice specially assigned to the Superior Court.

baby was suffering from shaken baby syndrome and a brain bleed.[1]  Trial Court Opinion, 6/9/16, at 1.  The Child was then transferred to St. Christopher's Hospital for Children ("St. Christopher's"), where "the report of child abuse was substantiated."  *Id.*

On December 12, 2012, the Child was placed in his current foster home.  N.T., 6/1/15, at 19-20; N.T., 9/1/15, at 76; Trial Court Opinion, 6/9/16, at 3 n.8, 9.  An aggravated circumstances hearing was held before the trial court on October 21, 2013, during which —

> Dr. [Maria] McColgan testified as an expert[] in pediatric child abuse . . . N.T. 10/21/1[3] at 54.  Dr. McColgan testified that to a degree of medical certainty, the Child's case was one of child abuse.  *Id.* at 74.  Dr. McColgan, [St. Christopher's] Medical Director of the Child Protection Program, indicated that the injuries to the Child were caused by non-accidental trauma and the Child was admitted to [St. Christopher's]; the injuries were certified as a near fatality.  *Id.* at 53, 68.

Trial Court Opinion, 6/9/16, at 2.  Dr. McColgan also testified that the Child had old rib fractures and showed signs of long-term deficits.  N.T., 10/21/13, at 55, 69.  Based on Dr. McColgan's unrefuted expert testimony that the Child suffered a nearly fatal event, the trial court adjudicated the Child dependent and found aggravated circumstances existed as to both Father and Mother.

---

[1] Dr. Maria McColgan, an expert in pediatric child abuse, testified that "shaken baby syndrome" is a colloquium used to describe the possible "mechanism" or movement that caused the injury.  Trial Court Opinion, 6/9/16, at 1 n.2 (citing N.T., 10/21/13, at 54, 109).

On August 4, 2014, the Child Advocate filed a petition for involuntary termination of Mother's rights pursuant to 23 Pa.C.S. § 2511(a)(1)-(2), (5), (8). Termination hearings were held on June 1, 2015, September 1, 2015, and November 10, 2015.

During the first hearing, the trial court heard testimony from Dende Korpoi and Courtney McDonald,[2] two DHS social workers assigned to the Child and Mother's case. Ms. Korpoi, who handled the case from June 2012 until late 2014, gave testimony that Mother had a Family Service Plan ("FSP"), with parenting and psychological/psychiatric goals, but Mother had not completed the requisite parenting classes. N.T., 6/1/15, at 9, 20, 23. Mr. McDonald, who was managing the case at the time of the hearing, stated that Mother was minimally compliant with the objective of creating a plan to prevent future harm to the Child if reunited. *Id.* at 86, 89-90, 93.

Mr. McDonald testified again during the second hearing; he stated that the Child's foster parents were interested in adoption. N.T., 9/1/15, at 20. At the same hearing, a foster care case worker from Bethany Christian Services, Anne Schlonoeker, testified that Mother's Individual Service Plan objectives "were to maintain visitation with [the Child], to maintain

---

[2] In the notes of testimony for June 1, 2015, the last name of this DHS social worker is spelled "MacDonald." In the notes of testimony for September 1, 2015 and the Trial Court Opinion, 6/9/16, at 3, his surname is spelled "McDonald." Since "McDonald" appears in two court documents and "MacDonald" appears in only one, we use "McDonald" throughout this memorandum opinion.

appropriate housing [and a] stable employment, to address any concerns that she had regarding [the Child,] and also to follow the recommendations of the FSP explained by DHS." N.T., 9/1/15, at 82. During this hearing, Mother also testified, explaining that she had a good relationship with the Child's foster parents. However, Mother did not accept responsibility for the Child's injuries, argued that there was a medical reason for the injuries, and did not believe that anyone inflicted injuries on the Child; Mother presented no expert testimony in support of her claim. *Id.* at 125-126, 136-137. In addition, on that same day, Father briefly testified that he was involved in therapy with a private therapist in 2014. *Id.* at 138.

At the third and final hearing, a forensic psychologist, Dr. Erica Williams, testified regarding Mother's parenting capacity evaluation in 2011. N.T., 11/10/15, at 12. Dr. Williams attested that, although Mother had a lot of strengths, they were insufficient to compensate for the one point of concern — that Mother will not explain how the Child's injuries occurred and will not create a plan to make sure that the Child does not experience such harm again. *Id.* at 18-20, 27.

After closing arguments, the trial court found that all of the witnesses, with the exception of Mother, were credible and accepted their testimony in full, while repudiating the testimony of Mother. N.T., 11/10/15, at 95-98. The trial court accounted for this finding as follows:

> [T]he [C]hild was brought into the ER screaming in pain, limp, had not been eating. . . . [S]haken baby syndrome was thought

- 4 -

to be one of the reasons. The [C]hild had old and new fractures, retinal hemorrhaging, and a subdural hematoma. Mo[ther] could not provide an explanation for the injuries. . . . [T]he [C]hild was fine when she left for work at 7:30 a.m. [T]he [C]hild was in the care of [Father] on 4/17/12. . . . [The parents] can provide permanency, but for the issue of their ability to show capacity for safety, but in general nice people.

*Id.* at 97-99. The trial court also found no parent-child bond. Trial Court Opinion, 6/9/16, at 5 (citing N.T., 11/10/15, at 103). The trial court "found that based on the evidence, it was in the best interests of the Child to be adopted and granted the termination of Mother's parental rights on November 10, 2015 based on 2511(a)(1), (2), (5), (8) and 2511(b)." Trial Court Opinion, 6/9/16, at 6 (citing N.T., 11/10/15, at 103-104). In support of its decision, the trial court explained:

After the findings of aggravated circumstances, the parents did nothing to regain custody of their child. Furthermore, after three years in DHS care, the parents have not given a plausible cause for the Child's substantial injuries, and . . . Father . . . invoked his Fifth Amendment protection from self-incrimination. The Child was four months old when he was removed from the parents' care and has never been returned.

Trial Court Opinion, 6/9/16, at 1.

Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b). On appeal, Mother presents two issues for our review:

A. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act 23 Pa. C.S.A. §2511 (a)(1),

(a)(2), (a)(5), and (a)(8) as [M]other made progress towards working and meeting her FSP goals, namely staying drug free, working towards obtaining housing, working on parenting skills, and other goals, during the [C]hild's placement? . . .

B. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental physical and emotional needs of the [C]hild as required by the Adoption Act 23 Pa. C.S.A. §2511(b)?

Mother's Brief at 4.

We consider Mother's issues mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2511, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants

termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

The trial court found that there was sufficient evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1)-(2), (5), (8), (b). We will affirm if we agree with the trial court's decision as to any one subsection of Section 2511(a) and as to Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we affirm the trial court's decision to terminate Mother's parental rights under subsections 2511(a)(2) and (b):

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

Because we affirm on these grounds, we will not address the remaining subsections of the statute at length. ***See In re N.A.M.***, 33 A.3d 95, 100 (Pa. Super. 2011).

Mother argues that the evidence does not support termination under Section 2511(a)(2), because —

[T]he trial Court erred when it ruled that conditions which led to mother's incapacity cannot be remedied in a reasonable period of time. Mother acknowledged her shortcomings as a parent, which is the first step to remedying the situation, and mother completed certain FSP objectives, which demonstrated that those conditions could be remedied. Furthermore, DHS did not prove with clear and convincing evidence otherwise.

Mother's Brief at 6.

Section 2511(a)(2) concerns the "physical or mental well-being" of the Child. In the current appeal, the Child suffered a near fatality, and there was a finding of aggravated circumstances and child abuse. Additionally, despite being only four months old, the Child already showed signs of "repeated and continued . . . abuse," 23 Pa.C.S. § 2511(a)(2), in the form of

an old rib fracture and injuries to his brain that were a likely result of long-term deficits. N.T., 10/21/13, 55, 69.

Also, the trial court concluded that "the conditions and causes of the . . . abuse . . . cannot or will not be remedied by [Mother]," 23 Pa.C.S. § 2511(a)(2), based on her conduct over a protracted period. After three years, both parents were still suspected of causing Child's nearly fatal injuries, and neither of them has given a plausible explanation or identified the cause. Trial Court Opinion, 6/9/16, at 9 (citing N.T., 9/1/15, at 76; N.T., 11/10/15, at 18-20). Even as of the second day of the termination hearings, Mother continued to posit unsupported medical theories for the Child's injuries, and refused to believe that anyone had inflicted injuries on the Child. N.T., 9/1/15, at 125-126, 136-137. If Mother is unwilling to recognize that there was abuse, she is unlikely to be able to remedy or to protect against it. In addition, Mother has not complied with all requirements of her FSP, including completion of her parenting classes and demonstration of her willingness to complete a plan to prevent future harm to the Child if reunited. N.T., 6/1/15, at 9, 20, 23, 86, 89-90, 93. Thus, the trial court appropriately found clear and convincing evidence that Mother's conduct satisfies the statutory grounds for termination. *See* 23 Pa.C.S. §

2511(a)(2); **L.M.**, 923 A.2d at 511.[3]  Accordingly, the first issue raised by Mother on appeal is without merit.

With respect to 23 Pa.C.S. § 2511(b), this Court has explained that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).  Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id.** (citation omitted).  However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.  The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

_____

[3] We also accept the trial court's findings under 23 Pa.C.S. § 2511(a)(1), (5), (8).  **See** Trial Court Opinion, 6/9/16, at 8-10.  Clear and convincing evidence demonstrates that the Child was four months old when he was removed from his biological parents' care and he has never been returned; the Child was placed with his foster parents in December 2012.  Trial Court Opinion, 6/9/16, at 1, 9; N.T., 9/1/15, at 76.  The petition for involuntary termination was filed on August 4, 2014.  Thus, for "at least six months immediately preceding the filing" of the termination petition, Mother failed to perform her parental duties, a ground for termination under Section 2511(a)(1).  The Child has also been "removed from the care of [Mother] by the court or under a voluntary agreement with an agency for a period of at least six months."  23 Pa.C.S. § 2511(a)(5).  Additionally, "12 months or more have elapsed from the date of removal or placement."  **Id.** § 2511(a)(8).

On appeal, Mother argues that the evidence does not support termination under Section 2511(b). She states:

> The trial Court erred in granting the DHS petition to involuntarily terminate the parental rights of mother because DHS failed to provide the Court with clear, competent, and convincing evidence that termination was in the best interest of the child, pursuant to 23 Pa.C.S.A. §2511(b). This means that the trial court must look at the parent-child relationship and examine how the effect of terminating that relationship will impact the child.

Mother's Brief at 6-7. We are unpersuaded by Mother's argument.

First, we note that Section 2511(b) does not require a bonding analysis at all. The term "bond" is not defined in the Adoption Act. The need for any bonding analysis depends on the unique facts and circumstances of each particular case. *See In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012).

In this case, there is some evidence of an emotional bond between Mother and the Child. According to Ms. Schlonoeker, who the trial court found to be credible, N.T., 11/10/15, at 95-98, the Child was always excited and "happy" to see Mother during their four hours of weekly supervised visits. N.T., 9/1/15, at 109, 119. Mother has punctually attended all 72 of these scheduled visits, and she would bring snacks and have "playtime" with the Child. *Id.* at 91-92, 119. During these visits, Mother and the Child would "cuddle," and he would sit on her lap and give her hugs and kisses. *Id.* at 119. Mother's behavior during these visits was described as "appropriate," and Mother and the Child would respond well to each other.

- 11 -

*Id.* at 119-120. The Child recognized Mother and would call her "Mom." *Id.* at 120.

Nevertheless, the existence of some bond between a child and a biological parent does not necessarily preclude termination of parental rights. *K.Z.S.*, 946 A.2d at 764. The question is whether an existing bond between the Child and Mother is "worth saving or whether it could be sacrificed without irreparable harm to the Child." *Id.*

Contrary to Mother's argument, the trial court could reasonably find by clear and convincing evidence that the bond is not so strong that it should not be terminated. *See generally K.Z.S.*, 946 A.2d at 762-763. According to Ms. Schlonoeker, the Child had no issues separating from Mother after each visit. N.T., 9/1/15, at 97, 110. Mother was described as nothing more than a "four-hour playmate" for the Child. *Id.* at 110. Most significantly, Ms. Schlonoeker testified that the Child would not suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 109-110. Ms. Schlonoeker added that the termination of Mother's parental rights would not be a significant change for the Child, because he had lived with his foster parents for three years, as of the date of the second termination hearing. *Id.* at 110-111. The Child does not look to Mother to care for his quotidian needs; he considers his foster parents' residence to be his home. *Id.* at 110-111. Ms. Schlonoeker also expressed her concern that Mother does not take responsibility for her role to keep the Child safe. *Id.* at 120.

It is important that the Child's relationships with his foster mother are irrefutably strong.

> [C]ourts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. . . . [T]ermination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

*T.S.M.*, 71 A.3d at 268-269.[4]  In the current case, the Child has a robust relationship with his foster family, is comfortable with his foster mother and foster siblings, and is safe in his foster home.  N.T., 6/1/15, at 38, 41-42.  His foster mother ensures that all of his needs are met on a daily basis, and the Child understands the rules and expectations of his foster parents.  *Id.* at 39; N.T., 9/1/15, at 19.  The Child calls his foster mother, "Mommy."  *Id.*

The Child's circumstances are analogous to the facts of *K.Z.S.*, 946 A.2d at 764, in which no evidence suggested that K.Z.S.'s mother had a bond with him equal to his bond with his foster mother.  This Court wrote:

> No evidence suggests . . . that terminating Mother's parental rights will sever an existing beneficial relationship, or that it will result in irreparable harm to K.Z.S.  Therefore, we agree with the court that the bond between K.Z.S. and [his foster mother] is the primary bond to protect, given K.Z.S.' young age and his very limited contact with Mother.  Because competent evidence

---

[4] In *T.S.M.*, we explained that "termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home," but that "the Adoption Act specifically provides that a pending adoption is not a prerequisite to termination of parental rights involving agencies," as is the case here.  71 A.3d at 268 (quoting 23 Pa.C.S. § 2512(b)).

of record supports the court's decision to terminate Mother's parental rights, we have no reason to disturb it.

*Id.* Similarly, in the present appeal, nothing in the record suggests that terminating Mother's parental rights will result in irreparable harm to the Child. The record supports the trial court's view that the bond between the Child and his foster mother is the primary bond to protect, given the Child's young age and his very limited contact with Mother. *See* Trial Court Opinion, 6/9/16, at 5. Since competent evidence of record supports the trial court's decision to terminate Mother's parental rights due, in part, to the lack of a strong emotional bond between parent and child, we have no reason to disturb it. *See L.M.*, 923 A.2d at 511.

Furthermore, the parent-child bond is not the only factor that a court can consider under 23 Pa.C.S. § 2511(b). "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re Adoption of C.D.R.,* 111 A.3d 1212, 1219 (Pa. Super. 2015) (citation and internal quotation marks omitted). "[T]he trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id.* (citation and internal quotation marks omitted). In its analysis of 23 Pa.C.S. § 2511(b), the trial court emphasized that the foster family "provides safety," whereas "there is no way to ensure

the safety of the Child [with Mother] because there was never an explanation for the Child's near fatality and no way to make sure that the Child was not endangered again."  Trial Court Opinion, 6/9/16, at 11 (citing N.T., 9/1/15, at 103-104; N.T., 11/10/15, at 18-20, 27).

Based on the foregoing, we discern no abuse of discretion by the trial court in concluding that the involuntary termination of Mother's parental rights serves the developmental, physical, and emotional needs and welfare of the Child pursuant to Section 2511(a) and (b).  Accordingly, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/22/2016